IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RICHARD S. LAUTER, not individually but solely as Creditor Trustee of the Gas-Mart USA, Inc. Creditor Trust, | § § § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. H-17-2028 |
| CITGO PETROLEUM CORPORATION, | § § | |
| Defendant. | § § | |

## MEMORANDUM OPINION AND ORDER

On June 30, 2017, plaintiff, Richard S. Lauter, as Creditor Trustee of the Gas-Mart USA, Inc. Creditor Trust, filed a Complaint (Docket Entry No. 1), against defendant, Citgo Petroleum Corporation ("Citgo"), asserting claims for breach of contract (Count I), violation of the automatic stay pursuant to 11 U.S.C. § 362 (Count II), and avoidance of preferential transfer pursuant to 11 U.S.C. § 547 (Count III). Pending before the court are Citgo Petroleum Corporation's Motion to Dismiss or in the Alternative for Summary Judgment as to Counts I and II and for Summary Judgment as to Count III (Docket Entry No. 14), plaintiff's Request for Oral Argument (Docket Entry No. 37), plaintiff's Motion for Leave to File Supplemental Authority in Support of Plaintiff's Response to Defendant's Motion to Dismiss (Docket Entry No. 38), and plaintiff's Motion for Leave to File Supplemental Authority in Support of Plaintiff's Response to Defendant's Motion to Dismiss

1

(Docket Entry No. 41). For the reasons stated below, Citgo's motion to dismiss Counts I and II will be granted, Citgo's motion for summary judgment on Count III will be granted, plaintiff's motion for oral argument will be denied, plaintiff's two motions for leave to file supplemental authority will be granted, and this action will be dismissed.

## I. **Relevant Facts and Procedural Background**[1]

On or about September 10, 2013, Gas-Mart USA ("Gas-Mart" or "Debtor") and Citgo entered into a Marketer Franchise Agreement ("Agreement").[2] Paragraph 5 of the Agreement governing "Terms of Payment" provided that in order to maintain a credit limit Gas-Mart could be required to furnish Citgo security agreements or other collateral.[3] Subsequently, Gas-Mart obtained a Surety Bond in the amount of $1,500,000.00 from Fidelity and Deposit Company of

---

[1]The relevant facts are taken from the Complaint, Docket Entry No. 1, the Statement of Material Facts in Citgo Petroleum Corporation's Memorandum in Support of Its Motion to Dismiss or in the Alternative for Summary Judgment as to Counts I and II and for Summary Judgment as to Count III ("Citgo's Memorandum"), Docket Entry No. 15, pp. 7-14, ¶¶ 1-41, and the Response to Statement of Material Facts and Statement of Additional Material Facts in Plaintiff's Response to Defendant's Motion to Dismiss and Memorandum of Authorities ("Plaintiff's Response"), Docket Entry No. 27, pp. 10-14, ¶¶ 1-50.

[2]Complaint, Docket Entry No. 1, p. 4 ¶¶ 15-19; Agreement, Exhibit 1 to Citgo's Memorandum, Docket Entry No. 15-3.

[3]Id. at ¶ 5(b).

Maryland ("Surety").[4]    On or about June 9, 2015, Gas-Mart made a payment of $68,185.69 to Citgo on certain outstanding invoices.[5]

On July 2, 2015 (the "Petition Date"), four Gas-Mart debtor corporations each filed separate voluntary petitions with the Bankruptcy Court seeking relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of Missouri (Case No. 15-41915-abf11).  On October 6, 2016, Fuel Service Mart, Inc. filed a separate voluntary petition for relief under Chapter 11.  By orders of the Bankruptcy Court entered on July 7, 2015, and on November 25, 2015, the Bankruptcy cases were jointly administered.[6]

On the Petition Date Citgo held $221,190.12 in Gas-Mart credit card receipts pursuant to the terms of the Agreement, and Gas-Mart moved for authorization to pay Citgo as a critical vendor.[7]  On July 28, 2015, the Bankruptcy Court entered an order granting the motion.[8]

---

[4]See Surety Bond included in Exhibit 3 to Citgo's Memorandum, Docket Entry No. 15-5, pp. 14-22.

[5]Complaint, Docket Entry No. 1, p. 13 ¶ 66.  See also Citgo's Memorandum, Docket Entry No. 15, p. 14 ¶ 39; Plaintiff's Response, Docket Entry No. 27, p. 12 ¶ 39.

[6]Complaint, Docket Entry No. 1, p. 3 ¶¶ 9-10, and 10 ¶ 20. See also Citgo's Memorandum, Docket Entry No. 15, p. 7 ¶ 4; Plaintiff's Response, Docket Entry No. 27, p. 10 ¶ 4.

[7]Citgo's Memorandum, Docket Entry No. 15, p. 7 ¶ 5; Plaintiff's Response, Docket Entry No. 27, p. 10 ¶ 5.  See also Complaint, Docket Entry No. 1, p. 5 ¶ 23 (alleging that Citgo held approximately $228,000.00 in credit card receipts).

[8]Critical Vendor Motion and Order, Exhibit 2 to Citgo's (continued...)

On or about August 6, 2015, Gas-Mart, the Surety, and Citgo entered into a Vendor Agreement governing their continued commercial relationship.[9] Pursuant to the Vendor Agreement the Surety agreed to make a payment to Citgo under the Surety Bond. Citgo contends that the Surety agreed to pay $756,391.18 pursuant to the Surety Bond, and in fact did make a payment pursuant to the bond.[10] Plaintiff acknowledges that the Surety agreed to make a payment to Citgo pursuant to the Surety Bond, but says it does not know the specific amounts that the Surety agreed to pay or, in fact, did pay pursuant to the Surety Bond.[11] On June 10, 2016, the Surety filed a Proof of Interim Administrative Claim in Gas-Mart's bankruptcy proceeding for $558,097.49.[12]

In January and February of 2016, Gas-Mart sold substantially all of its assets.[13]

---

[8](...continued)
Memorandum, Docket Entry No. 15-4. See also Citgo's Memorandum, Docket Entry No. 15, p. 7 ¶ 6; Plaintiff's Response, Docket Entry No. 27, p. 10 ¶ 6.

[9]Citgo's Memorandum, Docket Entry No. 15, p. 8 ¶ 7, and Plaintiff's Response, Docket Entry No. 27, p. 10 ¶ 7. Vendor Agreement, Exhibit 3 to Citgo's Memorandum, Docket Entry No. 15-5.

[10]Citgo's Memorandum, Docket Entry No. 15, p. 8, ¶¶ 8, 10.

[11]Plaintiff's Response, Docket Entry No. 27, p. 10 ¶¶ 8 and 10.

[12]Exhibit 4 to Citgo's Memorandum, Docket Entry No. 15-6.

[13]Citgo's Memorandum, Docket Entry No. 15, p. 8 ¶ 11 (citing Disclosure Statement, § V.A.5, Exhibit 7 to Citgo's Memorandum, Docket Entry No. 15-9, p. 21 of 117); Plaintiff's Response, Docket Entry No. 27, p. 10 ¶ 11.

On March 10, 2016, Gas-Mart filed Debtors' First Omnibus Motion to Reject Executory Contracts ("Rejection Motion"), which included a request to reject the Agreement with Citgo.[14] On April 5, 2016, the Bankruptcy Court entered its Order Granting Debtors' First Omnibus Motion to Reject Executory Contracts ("Rejection Order"), which provided that Gas-Mart's executory contracts were all rejected as of March 10, 2016.[15]

On July 21, 2016, the Creditors' Committee filed its Initial Plan and Disclosure Statement.[16] On September 21, 2016, the Bankruptcy Court confirmed the First Amended Plan of Liquidation (the "Plan"), which called for creation of a creditor trust, appointment of a creditor trustee, and execution of a creditor trust agreement.[17] Pursuant to Article II of the Gas-Mart USA, Inc.

---

[14]Citgo's Memorandum, Docket Entry No. 15, p. 8 ¶ 12; Plaintiff's Response, Docket Entry No. 27, p. 10 ¶ 12. <u>See also</u> Rejection Motion, Exhibit 5 to Citgo's Memorandum, Docket Entry No. 15-7.

[15]Citgo's Memorandum, Docket Entry No. 15, p. 9 ¶ 14; Plaintiff's Response, Docket Entry No. 27, p. 11 ¶ 14. <u>See also</u> Rejection Order, Exhibit 6 to Citgo's Memorandum, Docket Entry No. 15-8, p. 2 ¶ 13 ("The Rejected Contracts are hereby rejected as of March 10, 2016.").

[16]Citgo's Memorandum, Docket Entry No. 15, p. 9 ¶ 17; Plaintiff's Response, Docket Entry No. 27, p. 11 ¶ 17. <u>See also</u> Disclosure Statement with Respect to First Amended Plan of Liquidation Dated July 21, 2016, Exhibit 7 to Citgo's Memorandum, Docket Entry No. 15-9.

[17]Citgo's Memorandum, Docket Entry No. 15, p. 9 ¶ 18, and Plaintiff's Response, Docket Entry No. 27, p. 11 ¶ 18. <u>See also</u> Exhibit 8 to Citgo's Memorandum, Docket Entry No. 15-10, pp. 1-25
(continued...)

Creditor Trust Agreement, plaintiff was appointed as Trustee of the Creditor Trust.[18]

On or about March 11, 2016, Citgo brought suit in the Judicial District Court of Harris County, Texas, against the Surety to recover certain amounts due from Gas-Mart, and on April 7, 2016, the Surety removed the lawsuit to the United States District Court for the Southern District of Texas, Case No. 4:16-cv-00952 ("Surety Litigation").[19] In the Surety Litigation, Citgo alleged that after entering into the Vendor Agreement, Gas-Mart breached its agreements with Citgo by inter alia failing to pay for fuel purchases, store remodeling, and branding costs.[20] On November 1, 2016, the court granted the Surety's motion for summary judgment and denied Citgo's cross-motion for summary judgment, upon finding that store remodeling and branding costs were not included in the

---

[17](...continued)
of 97 (Order: (A) Confirming First Amended Plan of Liquidation Dated July 21, 2016 and (B) Approving Disclosure Statement with Respect to First Amended Plan of Liquidation Dated July 21, 2016 Pursuant to 11 U.S.C. § 1125); pp. 26-59 of 97 (Exhibit A, Modified First Amended Plan of Liquidation Dated July 21, 2016), and pp. 60-97 of 97 (Exhibit B, Gas-Mart USA, Inc. Creditor Trust Agreement).

[18]Citgo's Memorandum, Docket Entry No. 15, p. 9 ¶ 19; Plaintiff's Response, Docket Entry No. 27, p. 11 ¶ 19. See also Gas-Mart USA, Inc. Creditor Trust Agreement, Exhibit B to Exhibit 8 to Citgo's Memorandum, Docket Entry No. 15-10, p. 66 of 97.

[19]Citgo's Memorandum, Docket Entry No. 15, p. 12 ¶ 29; Plaintiff's Response, Docket Entry No. 27, p. 12 ¶ 29.

[20]Citgo's Memorandum, Docket Entry No. 15, p. 12 ¶ 30; Plaintiff's Response, Docket Entry No. 27, p. 12 ¶ 30.

obligations covered by the Surety Bond, and that on April 6, 2017 (after the filing of the Surety Litigation), the Surety paid Citgo $35,367.31 for Gas-Mart's post-Vendor Agreement failure to pay for fuel.[21] On April 6, 2017, the court entered a Final Judgment disposing of all claims and counterclaims in the Surety Litigation.[22]

On June 30, 2017, plaintiff initiated this action by filing his Complaint (Docket Entry No. 1) alleging three causes of action: Count I for breach of contract, Count II for violation of the automatic stay pursuant to 11 U.S.C. § 362, and Count III for avoidance of preferential transfer pursuant to 11 U.S.C. § 547. Each of plaintiff's claims are premised on allegations that after the Petition Date Citgo engaged in actions that caused Gas-Mart's reorganization to fail.[23]

---

[21]Citgo's Memorandum, Docket Entry No. 15, p. 12 ¶ 31; Plaintiff's Response, Docket Entry No. 27, p. 12 ¶ 31. <u>See also</u> Memorandum Opinion and Order, Exhibit 25 to Citgo's Memorandum, Docket Entry No. 15-27 (Docket Entry No. 26 in Civil Action No. H-16-0952).

[22]Citgo's Memorandum, Docket Entry No. 15, p. 13 ¶ 332; Plaintiff's Response, Docket Entry No. 27, p. 12 ¶ 32. <u>See also</u> Final Judgment, Exhibit 10 to Citgo's Memorandum, Docket Entry No. 15-12 (Docket Entry No. 31 in Civil Action No. H-16-0952).

[23]Complaint, Docket Entry No. 1, p. 10 ¶¶ 48-49.

## II. **Motion to Dismiss Counts I and II**

Citgo argues that Count I for breach of contract and Count II for violation of the automatic stay are subject to dismissal because plaintiff lacks standing to pursue these claims that were not adequately preserved in Gas-Mart's confirmed plan as required by well-established Fifth Circuit law applying 11 U.S.C. § 1123.[24] Alternatively, Citgo argues that plaintiff's stay violation claim is barred by laches, and that plaintiff lacks standing to pursue the breach of contract claim because (1) Gas-Mart rejected the Agreement pursuant to 11 U.S.C. § 365(g) and is thus deemed to have breached the Agreement as of the Petition Date thereby relieving Citgo of its duty to perform, (2) the Surety paid the Surety Bond securing Gas-Mart's performance thereby subrogating to the Surety any breach of contract claim that Gas-Mart may have had against Citgo, and (3) res judicata resulting from the Surety Litigation between Citgo and the Surety bars the plaintiff's breach of contract claim.[25]

---

[24]Citgo's Memorandum, Docket Entry No. 15, pp. 15-21 ¶¶ 44-57. Citgo does not dispute that the avoidance of preferential transfer claim asserted in Count III was adequately preserved. See id. at 20 n. 8 ("CITGO notes that claims for preferences (Count III) are identified and CITGO appears by name on a list of potential targets for such claims. CITGO does not assert that those claims, to the extent the Debtor held them, were not preserved. CITGO does not admit any liability on such claims. This argument applies only to Counts I and II for claims not preserved.").

[25]Id. at 22-29 ¶¶ 58-73.

## A.    Standard of Review

Citgo's argument that plaintiff lacks standing to pursue the claims asserted in Counts I and II raises issues that the Fifth Circuit has characterized as jurisdictional. See <u>Dynasty Oil and Gas, LLC v. Citizens Bank (In re United Operating, LLC)</u>, 540 F.3d 351, 354 (5th Cir. 2008) ("Standing is a jurisdictional requirement, and we are obliged to ensure it is satisfied regardless whether the parties address the matter."); <u>Spicer v. Laguna Madre Oil & Gas II, L.L.C. (In re Texas Wyoming Drilling, Inc.)</u>, 647 F.3d 547, 550 (5th Cir. 2011) (characterizing the question of standing to assert post-confirmation claims based on adequacy of preservation language in confirmed plan as a jurisdictional question). Although Citgo has moved for dismissal under Rule 12(b)(6) for failure to state a claim for which relief may be granted, motions to dismiss for lack of standing and, therefore, for lack jurisdiction are governed by Rule 12(b)(1). See <u>Rossco Holdings, Inc. v. McConnell</u>, Civil Action No. 4:14-cv-374-O, 2014 WL 11460917, * 2 (N.D. Tex. July 23, 2014)("Because the question of standing implicates the court's subject-matter jurisdiction, the court applies the standards for a motion to dismiss pursuant to Rule 12(b)(1)."), <u>aff'd</u> 613 Fed. App'x 302 (5th Cir. June 1, 2015) (per curiam), <u>cert. denied</u>, 136 S. Ct. 339 (2015); <u>Adler v. Walker (In re Gulf States Long Term Acute Care of Covington, L.L.C.)</u>, Civil Action No. 11-1659, 2012 WL 710924, * 2

(E.D. La. March 5, 2012) (analyzing motion to dismiss for lack of standing based on confirmed plan's failure to preserve claims for post-confirmation prosecution as a jurisdictional challenge), aff'd, 614 F. App'x 714 (5th Cir. 2015) (per curiam).

"Lack of subject matter jurisdiction may be found in any one of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." Ramming v. United States, 281 F.3d 158, 161 (5th Cir. 2001) (per curiam), cert. denied sub nom. Cloud v. United States, 122 S. Ct. 2665 (2002). Rule 12(b)(1) challenges to subject matter jurisdiction come in two forms: "facial" attacks and "factual" attacks. See Paterson v. Weinberger, 644 F.2d 521, 523 (5th Cir. 1981). A facial attack consists of a Rule 12(b)(1) motion unaccompanied by supporting evidence that challenges the court's jurisdiction based solely on the pleadings. Id. A factual attack challenges the existence of subject matter jurisdiction irrespective of the pleadings, and matters outside the pleadings such as testimony and affidavits may be considered. Id. Because Citgo's motion is accompanied by supporting evidence, Citgo's motion to dismiss for lack of standing is a factual attack. The burden of proof regarding the existence of jurisdiction always rests with the plaintiff. Ramming, 281 F.3d at 161. Dismissal on jurisdictional grounds is not on the merits. Id.

**B. Analysis**

### 1. Plan Documents Preserved the Breach of Contract Claim But Not the Stay Violation Claim

The parties do not dispute that the plan documents provided for the establishment of a creditor trust, appointment of the plaintiff as trustee of the creditor trust authorized to pursue causes of action, and transfer of all the estate assets — including causes of action — to the creditor trust upon confirmation of the Plan. In dispute is whether the plan documents adequately reserved the plaintiff's breach of contract and stay violation claims. Asserting that "Fifth Circuit cases make clear, non-avoidance claims are properly preserved pursuant to [§] 1123 only when the plan materials, at a minimum, identify (i) the nature of the claims reserved; (ii) the categories of potential defendants, and (iii) the value of those claims[,]"[26] Citgo argues that the plan documents do not satisfy these requirements.[27]

Asserting that "the proper law to apply to determine the adequacy of the Plan and Disclosure Statement is that of the Eighth Circuit, the circuit which confirmed the Plan and initially determined that it was adequate,"[28] plaintiff argues that <u>Harstad v. First American Bank</u>, 39 F.3d 898 (8th Cir. 1994), is the

---

[26]<u>Id.</u> at 18 ¶ 50.

[27]<u>Id.</u> at 18-20 ¶¶ 51-53 (stay violation); 20-21 ¶¶ 54-57 (breach of contract).

[28]Plaintiff's Response, Docket Entry No. 27, p. 17 ¶ 56.

controlling authority.[29] Alternatively, plaintiff argues that "even under Fifth Circuit law, [he] prevails."[30] Citing <u>Lovett v. Cardinal Health, Inc. (In re Diabetes America, Inc.)</u>, 485 B.R. 340, 343 (Bankr. S.D. Tex. 2012), plaintiff argues that Citgo "improperly inflates" the Fifth Circuit's requirements for preserving claims because the Fifth Circuit does not require identification of prospective defendants or the value of preserved claims.[31] Attached to plaintiff's two motions for leave to submit supplemental authority (Docket Entry Nos. 38 and 41), are opinions that plaintiff argues show that Citgo has misstated the Fifth Circuit's requirements: <u>ASARCO, LLC v. Montana Resources, Inc.</u>, 514 B.R. 168 (S.D. Tex. 2013); <u>Tepper v. Keefe Bruyette & Woods, Inc.</u>, No. 3:11-CV-2087-L-BK, 2012 WL 4119490 (N.D.Tex. Sept. 19, 2012); <u>THINK3 Litigation Trust v. Zuccarello (In re THINK3)</u>, 529 B.R. 147 (Bankr. W.D. Tex. 2015); and <u>Nestlé Waters North America, Inc. v. Mountain Glacier LLC (In re Mountain Glacier LLC)</u>, 877 F.3d 246 (6th Cir. 2017). Because the court has read and considered these opinions, plaintiff's two motions for leave to file supplemental authority (Docket Entry Nos. 38 and 41) will be granted.

---

[29]<u>Id.</u> at ¶ 57.

[30]<u>Id.</u> at ¶ 56.

[31]<u>Id.</u> at 18-19 ¶¶ 58-60.

(a)  Applicable Law

Filing a case under the Bankruptcy Code creates a bankruptcy estate that is generally comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case," 11 U.S.C. § 541(a)(1), including causes of action.  <u>See</u> <u>Compton v. Anderson (In re MPF Holdings US, LLC)</u>, 701 F.3d 449, 453 (5th Cir. 2012), <u>vacating and remanding</u>, 443 B.R. 736 (Bankr. S.D.Tex. 2011).  In Chapter 11 cases where the debtor assumes debtor-in-possession status, the debtor typically has "most of the powers of a bankruptcy trustee, including the power to pursue claims belonging to the estate."  <u>Id.</u> (citing <u>In re United Operating</u>, 540 F.3d at 355 (citing 11 U.S.C. § 1107)).  Upon confirmation of the Chapter 11 plan, however, the bankruptcy estate ceases to exist, and the ability to pursue causes of action belonging to the estate ends unless the plan documents preserve causes of action for enforcement by the debtor or another party — such as a liquidating or litigation trustee — in accordance with 11 U.S.C. § 1123(b)(3).[32]  <u>Id.</u>  See also <u>In re United Operating</u>, 540 F.3d at 355 ("If a debtor has not made an effective reservation, the debtor has no standing to pursue a claim that the estate owned before it was dissolved.").

---

[32]This statute states: ". . . a plan may— . . . provide for . . . the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any . . . claim or interest [belonging to the debtor or to the estate]."  11 U.S.C. § 1123(b)(3).

13

### (1) Fifth Circuit Law Applies

Because Gas-Mart's bankruptcy case was filed and confirmed in the Eighth Circuit, plaintiff argues that the applicable law is that of the Eighth Circuit as stated in Harstad, 39 F.3d at 898.[33] In Harstad, 39 F.3d at 898, reorganized debtors filed a post-confirmation action against a bank seeking to recover allegedly preferential transfers. The bankruptcy court granted the defendant's motion to dismiss upon concluding that the debtors lacked standing to pursue preference claims because the confirmed plan did not preserve the ability to do so. The district court affirmed and the reorganized debtors appealed. In support of their argument that they had standing because their plan preserved the right to sue for preferential transfers, the reorganized debtors cited the following excerpt from Article X of the confirmed plan:

> The Court will retain jurisdiction until this Plan has been fully consummated for the following purposes: . . . [D]etermination of all causes of actions [sic] between Debtors and any other party, including but not limited to any right of Debtors to recover assets pursuant to the provisions of the Bankruptcy Code. . .

Id. at 902. Rejecting the debtors' argument that the cited language preserved their claims, the Eighth Circuit explained that

> Article X, captioned "Continuing Jurisdiction," concerns the ongoing jurisdiction of the Bankruptcy Court for matters that arise after plan confirmation. Noting the retention of the court's statutory jurisdiction to hear post-confirmation matters is a far cry from reserving to the debtors a right to bring post-confirmation claims to

---

[33]Plaintiff's Response, Docket Entry No. 27, p. 17 ¶¶ 56-57.

recover preferences paid by the debtors but never disclosed by them during the pre-confirmation proceedings. We hold that the above-quoted language is not a retention of the claim at issue here—much less the "specific and unequivocal" retention that some courts require.

Id. (citations omitted; emphasis added). The court observed that

if the Harstads wished to retain the power to enforce this claim pursuant to § 1123(b)(3), it would have been a simple matter to do so with straight-forward language (although not so easy to do without alerting their creditors and the Bankruptcy Court to the possibility of viable preference claims).

Id. The court explained:

We view § 1123(b)(3) as, at least in part, a notice provision. Creditors have the right to know of any potential causes of action that might enlarge the estate—and that could be used to increase payment to the creditors. Even if, as the Harstads claim, they gave notice of such claims by indicating in their disclosure statement that the availability of such claims was being investigated, the creditors are entitled to know if the debtors intend to pursue the preferences in post-confirmation actions. Compliance with § 1123(b)(3) gives notice of that intent. Only then are creditors in a position to seek a share of any such recoveries, contingent though they may be, and to have the mechanics of the preference-sharing spelled out in the plan. Creditors are in no position to do so if they are not on notice that the debtor retains the power to pursue recovery.

Id. at 903.

Because the Eighth Circuit held that the language at issue in Harstad did not preserve the debtors' ability to pursue claims following confirmation but, instead, provided for continuing jurisdiction of the bankruptcy court, that holding is inapposite as it did not address requirements for preserving claims under

15

§ 1123(b)(3). To the extent that <u>dicta</u> in <u>Harstad</u> suggests such requirements, it shows that the Eighth Circuit views § 1123(b)(3) as a notice provision requiring language that will alert creditors to the possibility of future recovery, and believes that preservation language should be "straight-forward." <u>Id.</u> at 902. Plaintiff has not cited authority showing that the requirements suggested by <u>Harstad</u> differ from the requirements applied by the Fifth Circuit. Because the seminal Fifth Circuit case on this issue cites <u>Harstad</u> in support of its conclusions that a reservation of rights must be "specific and unequivocal," and that a "debtor must put its creditors on notice of any claim it wishes to pursue after confirmation," <u>In re United Operating</u>, 540 F.3d at 355, the court concludes that resolution of the standing issue now before the court would be the same regardless of whether the law of the Eighth or the Fifth Circuit is applied. Moreover, since plaintiff failed to offer any choice-of-law analysis, the court concludes that the applicable law is that of the Fifth Circuit. <u>See</u> <u>Rossco Holdings</u>, 613 Fed. App'x at * 305 (applying Fifth Circuit law in an action filed in the Western District of Texas in which a question of standing to assert post-confirmation claims arose with respect to a bankruptcy case filed and confirmed in the Ninth Circuit where plaintiff asserted that Ninth Circuit law applied, but failed to brief the choice-of-law issue).

## (2)    Fifth Circuit Law

The Fifth Circuit's requirements for preserving claims under 11 U.S.C. § 1123(b)(3) are explained in (1) In re United Operating, 540 F.3d at 351, (2) In re Texas Wyoming Drilling, 647 F.3d at 547, and (3) In re MPF Holdings, 701 F.3d at 449.

In re United Operating involved the efforts of a creditors' committee to pursue pre-confirmation bankruptcy and common-law claims for fraud, breach of fiduciary duty, and negligence against a court-appointed operator of the debtor's oil and gas properties and the lender that sought the operator's appointment.  540 F.3d at 351.    The plan contained a blanket reservation of any and all claims arising under the Bankruptcy Code, and a more specific reservation of claims arising under identified sections of the Bankruptcy Code.  The plan did not, however, say anything about the common law claims that the creditors' committee filed against the operator and the lender.  The Fifth Circuit held that

> [n]either the Plan's blanket reservation of "any and all claims" arising under the Code, nor its specific reservation of other types of claims under various Code provisions are sufficient to preserve the common-law claims [plaintiff] now brings for, *inter alia*, fraud, breach of fiduciary duty, and negligence.

Id. at 356.  The court explained that "[f]or a debtor to preserve a claim, the plan must expressly retain the right to pursue such actions," id. at 355 (citation omitted), that "[t]he reservation must be 'specific and unequivocal,'" id. (quoting Harstad, 39 F.3d at 902), and that "[i]f a debtor has not made an effective

17

reservation, the debtor has no standing to pursue a claim that the estate owned before it was dissolved." Id. The court explained this rule as "a logical consequence of the nature of a bankruptcy, which is designed primarily to 'secure prompt, effective administration and settlement of all debtor's assets and liabilities within a limited time,'" id., that is needed because "[p]roper notice allows creditors to determine whether a proposed plan resolves matters satisfactorily before they vote to approve it." Id.

In re Texas Wyoming Drilling involved a reorganized debtor who filed post-confirmation avoidance actions against the debtor's former shareholders seeking to recover dividends paid while the debtor was insolvent. 647 F.3d at 549. The plan provided for the debtor to retain "Estate Actions," defined to include "claims under Chapter 5 of the Bankruptcy Code." Id. The disclosure statement provided more specifically that "Estate Actions" included "various potential avoidable transfers," id., and also included "a chart outlining 'various claims and causes of action the Debtor or the Reorganized Debtor may pursue on behalf of the Debtor's Estate.'" Id. The chart identified as a potential defendant, "'[v]arious pre-petition shareholders of the Debtor' who might be sued for 'fraudulent transfer and recovery of dividends paid to shareholders,' valuing the claims at approximately $4 million." Id. The defendants argued that the preservation language in the

plan documents failed the In re United Operating "specific and unequivocal" test because it failed to identify potential defendants individually. After first considering and deciding that disclosure statements could be considered for purposes of determining whether a claim had been adequately preserved, id. at 551, the Fifth Circuit held that the reorganized debtor had standing to pursue the avoidance actions because the plan documents adequately preserved those claims. Id. at 552. The Fifth Circuit explained that the plan documents were sufficiently "specific and unequivocal" to preserve the avoidance actions because

> [u]nlike the plan in In re United Operating, which contained only a blanket reservation of "any and all claims," TWD's plan and disclosure statement revealed the existence of the Avoidance Actions, the possible amount of recovery to which they would lead, the basis for the actions (namely, pre-petition dividends and transfers to equity interest holders), and that the reorganized debtor intended to pursue the claims. The terms of TWD's plan and disclosure statement are far more specific than those in In re United Operating.

Id. at 551.

In re MFP Holdings involved a litigation trustee seeking to pursue avoidance actions against vendors with whom the debtor had contracts. 701 F.3d at 452. When several of the vendors sought dismissal either because the claims against them had been released or because recovery was barred by the debtor's assumption of their contracts during bankruptcy, the bankruptcy court sua sponte raised the issue of whether the plan satisfied the Fifth Circuit's "specific and unequivocal" standard for preserving claims. Id.

19

(citing 443 B.R. at 748-55). The bankruptcy court ultimately dismissed the litigation trustee's claims for lack of standing. Id. at 453. The bankruptcy court based its decision on its conclusion that an effective preservation of claims must satisfy three requirements: (1) individually identify the parties to be sued post-confirmation, (2) state that each party will be sued, and (3) set forth a legal basis for the suit. Id. at 452 (citing 443 B.R. at 744-45). The bankruptcy court held that the plan was not sufficiently unequivocal because it only reserved avoidance actions that "may exist" against identified parties instead of actions that "do exist and will be prosecuted," id. (citing 443 B.R. at 749-50), and because the plan contained ambiguous language that could be read to have released some of the defendants being sued. Id. (citing 443 B.R. at 750-55). On appeal the Fifth Circuit vacated the bankruptcy court's opinion explaining that the first two requirements for preserving claims identified by the bankruptcy court were not mandated by In re United Operating. Id. at 455. Observing that traditional rules of contract interpretation could be used to guide a court's review of plan documents, the Fifth Circuit remanded the case for determination of whether individual defendants were "released in connection with or under the Plan or by prior order of the Court." Id. at 457.

Citgo cites In re United Operating, In re Texas Wyoming Drilling, and In re MPF Holdings and other Fifth Circuit opinions

applying the holdings in those three cases in support of its assertion that "non-avoidance claims are properly preserved pursuant to [§] 1123 only when the plan materials, at a minimum, identify (i) the nature of the claims reserved, (ii) the categories of potential defendants, and (iii) the value of those claims."[34] But none of the opinions that Citgo cites has held either that the standard for effectively preserving non-avoidance claims differs from the standard for preserving avoidance claims, or that the

---

[34]Id. at 18 ¶ 50. See also Citgo Petroleum Corporation's Reply in Support of Motion to Dismiss or, in the Alternative, for Summary Judgment as to Counts I and II, and for Summary Judgment as to Count III ("Citgo's Reply"), Docket Entry No. 34, p. 13 ¶ 18 ("In its Motion, CITGO describes—from seven different Fifth Circuit opinions issued between 2008 and 2015—how the "specific and unequivocal" standard is more demanding for *non-avoidance* claims than avoidance claims. See, e.g., Motion ¶¶ 45-50."). The other opinions that Citgo cites are: In re Gulf States, 614 F. App'x at 719 (holding that "[t]he Plan's reservation of '[a]ny and all other claims and causes of action which may have been asserted by the Debtor prior to the Effective Date' is exactly the sort of blanket reservation that is insufficient to preserve the debtor's standing"); Wooley v. Haynes & Boone, L.L.P. (In re SI Restructuring Inc.), 714 F.3d 860, 865 (5th Cir. 2013) (holding that claims for breaches of fiduciary duties were not effectively preserved because "[n]either the Plan nor the disclosure statement references specific state law claims for fraud, breach of fiduciary duty, or any other particular cause of action. Instead, the Plan simply refers to all causes of action, known or unknown. . . [S]uch a blanket reservation is not sufficient to put creditors on notice."); Rossco Holdings, 613 F. App'x at 308 (holding that plaintiffs lacked standing to pursue malpractice and negligent misrepresentation claims because they were not identified in the confirmed plans); and The National Benevolent Association of the Christian Church (Disciples of Christ) v. Weil, Gotshal & Manges, LLP, 333 F. App'x 822, 827-29 (5th Cir. 2009) (per curiam) (holding that ambiguity in plan language precluded finding that plan specifically and unequivocally preserved claims for pre-petition legal malpractice).

21

"specific and unequivocal" standard requires something more than the retention of claims. See In re Texas Wyoming Drilling, 647 F.3d at 552 ("We observe that In re United Operating focused exclusively on the retention of claims. It never held that intended defendants must be named in the plan. But it did cite with approval In re Ice Cream Litigation . . .").

In In re United Operating, 540 F.3d at 355-56, the Fifth Circuit cited In re Ice Cream Liquidation, 319 B.R. 324 (D. Conn. 2011), with approval for its holdings that a categorical reservation of "preference claims" was (1) sufficient to preserve claims for preferential transfers even though neither the plan nor the disclosure statement identified specific transfers, transferees, or categories of transfers or transferees involved in actions to be brought post-confirmation, 319 B.R. at 337-38, but (2) was not sufficient to preserve claims for turnover. Id. at 333-34. The court explained that the plan identified specific sections of the Bankruptcy Code under which preference claims would be brought, but that neither the plan nor the disclosure statement mentioned turnovers or § 542(b), the section of the Bankruptcy Code that governs turnovers. Id. at 337-38. See also Crescent Resources Litigation Trust v. Burr (In re Crescent Resources, LLC), 463 B.R. 423, 433 (Bankr. W.D. Tex. 2011) (concluding that In re Ice Cream Liquidation stands for "the proposition that listing causes of action by code section is 'specific and unequivocal.'").

While the Fifth Circuit has held that plan documents that identify the nature of the claims reserved, categories of potential defendants, and value of the claims satisfy the "specific and unequivocal" standard, see In re Texas Wyoming Drilling, 647 F.3d at 552, the Fifth Circuit has not held, as Citgo contends, that all of this information is always required to satisfy that standard. Instead, the Fifth Circuit has emphasized that "[t]hough the degree of specificity involved in a plan's reservation of claims will often vary, the reservation must, at a minimum, be specific enough to put 'creditors on notice of any claim [the debtor] wishes to pursue after confirmation.'" In re SI Restructuring Inc., 714 F.3d at 864 (quoting In re United Operating, 540 F.3d at 355). See also In re Crescent Resources, 463 B.R. at 430 (recognizing that because "there has been no binding case to define definitively what the court meant by ["specific and unequivocal"] . . . courts have attempted to determine if a reorganized debtor retained standing on a case-by-case basis"). After carefully reviewing the Fifth Circuit's analyses of the "specific and unequivocal" standard, one bankruptcy observed that

> [q]uestions remain. Especially important for this case is whether categorical identification of prospective defendants is required.
>
> Another unanswered question is how specifically the retention language must describe the basis of recovery.

In re Diabetes, 485 B.R. at 346. Both of these questions are at issue in the action now before the court.

(b) Application of the Law to the Facts

Plaintiff's breach of contract claim alleges that

51. The Agreement entered into by and between Gas-Mart and Citgo was a valid and enforceable contract.

52. Citgo materially breached the Agreement in several respects, including, but not limited to:

   a. by failing to meet its obligation to supply fuel to Gas-Mart for nearly two weeks from the time that Gas-Mart filed for bankruptcy, despite the fact that it was fully secured against any potential default by Gas-Mart;

   b. by creating unreasonable and arbitrary restrictions on fuel allocation that caused Gas-Mart to run out of fuel on multiple occasions throughout its bankruptcy;

   c. by failing and refusing to honor its ten-day credit terms set forth in the Agreement throughout Gas-Mart's bankruptcy;

   d. by failing and refusing to provide the contractual 1% rebate to Gas-Mart for cash in advance purchases of fuel;

   e. by failing to properly credit and/or setoff Gas-Mart's account for purchases made with credit cards; and

   f. by continuing to keep Gas-Mart's credit card receipts in breach of its agreement to resume supplying fuel in exchange for being permitted to keep said receipts.[35]

Plaintiff's stay violation claim alleges that by engaging in these and other actions Citgo violated the automatic stay.[36]

---

[35]Complaint, Docket Entry No. 1, pp. 10-11 ¶¶ 51-52. See also id. at p. 4 ¶ 17 (defining "Agreement" as the September 10, 2013, Marketer Franchise Agreement).

[36]Id. at 12 ¶ 60.

**(1)    The Plan Documents**

Gas-Mart's confirmed Plan contains a paragraph titled "Vesting of Assets" that states:

> **On the Effective Date, the Creditor Trust Assets (including, without limitation, all Causes of Action) will be transferred to and vest in the Creditor Trust** and be deemed contributed thereto, subject to the terms of the Plan and Confirmation Order. **All Causes of Action shall survive confirmation and the commencement of prosecution of Causes of Action shall not be barred or limited by any *res judicata* or estoppel,** whether judicial, equitable or otherwise, based upon, *inter alia*, confirmation of the Plan or the extent to which the Plan, Disclosure Statement, Schedules of Assets and Liabilities, or Statements of Financial Affairs identify any Causes of Action. **The Creditor Trustee's right to commence and prosecute Causes of Action (including, without limitation, Avoidance Actions) shall not be abridged or materially altered in any manner by reasons of confirmation of the Plan.** All property held in the Creditor Trust for distribution pursuant to the Plan will be held solely in trust for the holders of Allowed Professional Fee Claims, Allowed Other Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Class 1A-1E Claims, Allowed Class 2.1A-2.1L Claims and Allowed Class 3A-3E Claims and will not be deemed property of the Debtors. . . .[37]

Section 1.1.15 of the Plan defines "Causes of Action" to mean:

"[A]ll claims and causes of action of the Debtors and their Estates as of the Effective Date, **whether arising under any contract, tort, the Bankruptcy Code,** or other federal or state law . . ."[38]

---

[37]Modified First Amended Plan of Liquidation Dated July 21, 2016, Article VII, § 7.1.1, Exhibit A to Exhibit 8 to Citgo's Memorandum, Docket Entry No. 15-10, pp. 48-49 of 97 (emphasis added).

[38]Id. at Article I, § 1.1.15, p. 26 of 97.

The Disclosure Statement lists "Causes of Action" among assets that

> will either be used to fund payments to be made under the Plan on the Effective Date or transferred to the Creditor Trust . . . to fund distributions to Creditors in accordance with the Plan and the Creditor Trust Agreement:

. . .

> **2. Causes of Action.** The Committee believes the Creditor Trustee may be able to pursue Causes of Action against several entities, including, without limitation, those set forth on **Exhibit B** hereto and the list of transfers disclosed in the Debtors' Statements of Financial Affairs. The categories of potential Causes of Action include Avoidance Actions, other Claims against Insiders, and [O]ther Claims. Each of these categories is discussed in more detail below.

> **a. Avoidance Actions.**

> **b. Other Claims Against Insiders.** . . .

> **c. Other Claims.** The Committee believes the Creditor Trustee may be able to assert other Causes of Action belonging to the Debtors and their Estates. Such Causes of [A]ction would include, without limitation, **claims for breach of contract,** tort, **the Bankruptcy Code,** or other federal or state law.[39]

The list of potential defendants included in Exhibit B to the Disclosure Statement includes the defendant in this action, Citgo.[40]

---

[39]Disclosure Statement, Article VI.A.2, Exhibit 7 to Citgo's Memorandum, Docket Entry No. 15-9, pp. 23-24 of 117.

[40]Exhibit B to Disclosure Statement, Docket Entry No. 15-9, p. 115 of 117.

**(2)    The Plan Documents Preserve the Contract Claim**

The court concludes that the plan documents are sufficiently "specific and unequivocal" to preserve to the plaintiff as trustee of the Gas-Mart Creditor Trust the right to pursue breach of contract claims against Citgo because the plan provides that (1) "[o]n the Effective Date, the Creditor Trust Assets (including, without limitation, all Causes of Action) will be transferred to and vest in the Creditor Trust," (2) "[a]ll Causes of Action shall survive confirmation and the commencement of prosecution of Causes of Action shall not be barred or limited by any *res judicata* or estoppel," (3) "[t]he Creditor Trustee's right to commence and prosecute Causes of Action (including, without limitation, Avoidance Actions) shall not be abridged or materially altered in any manner by reasons of confirmation of the Plan," because the Plan defines "Causes of Action" to mean: "[A]ll claims and causes of action of the Debtors and their Estates as of the Effective Date, whether arising under any **contract**, . . .," and because the Disclosure Statement not only lists "Causes of Action" among assets to be transferred to the Creditor Trust to fund distributions to creditors, but also identifies three categories of causes of action, one of which is "Other Claims" defined to include "Causes of Action . . for **breach of contract**," and includes an exhibit (Exhibit B) identifying potential defendants, including Citgo. In short, the plan documents are "specific and unequivocal" because

27

they state the basis of recovery, _i.e._, breach of contract, and identify the defendant by name. See In re MPF Holdings, 701 F.3d at 457 ("In addition to stating the basis of recovery, the Exhibits referenced in the Reorganization Plan identified each defendant by name. Accordingly, we hold that the reservation language in the Reorganization Plan was sufficiently specific and unequivocal under _United Operating_.").

Citgo argues that the plan documents are not sufficient to preserve plaintiff's breach of contract claim because "[p]laintiff has failed to identify any case in which a breach-of-contract . . . claim . . . was preserved without identifying the categories of defendants to be pursued or the nature and value of the claim."[41] Citgo has not, however, cited any case in which a court has even considered language purporting to reserve claims for breach of contract much less a case holding that preservation of a contract claim requires identification of categories of potential defendants or the value of the claims.[42] Moreover, in response to Citgo's argument plaintiff has submitted supplemental authority including two cases from courts in this circuit that have considered and rejected analogous arguments with respect to the preservation of contract claims, _i.e._, Tepper, 2012 WL 4119490 at *4, and In re THINK3, 529 B.R. at 203.

---

[41]Citgo's Reply, Docket Entry No. 34, p. 14 ¶ 18.

[42]See n. 34, above (describing the cases Citgo cites).

In <u>Tepper</u>, 2012 WL 4119490, at *4, the court held that "the Plan's categorical reference to and reservation of contract claims . . . is sufficiently specific to reserve Plaintiff's contract claim. . ." The plan documents did not identify any potential defendant either individually or categorically, and did not identify the value of any preserved claims. <u>Id.</u> at *2-*5. Citing <u>In re Texas Wyoming Drilling</u>, 647 F.3d 552, for its observation that "*In re United Operating* focused exclusively on the retention of *claims*. . .," <u>id.</u> at *4, the court reasoned that "neither *In re Texas Wyoming Drilling* nor *In re United Operating* requires that a specific prospective defendant, potential amount of recovery, or the claim basis be included in a plan or disclosure statement to satisfy the specific and unequivocal standard for reserving claims." <u>Id.</u> at *5. In <u>In re THINK3</u> the court held the "specific and unequivocal" standard satisfied because the plan "specifically identified the type of claim at issue (contract and debt) and specifically named the defendant." 529 B.R. at 203.

Because the plan documents at issue specifically identify contract claims as a type of claim being reserved, and specifically identify Citgo as a potential defendant they are specific enough to put creditors on notice of the trustee's intent to pursue post-confirmation claims for breach of contract. The court concludes therefore that the plan documents satisfy the Fifth Circuit's "specific and unequivocal" standard for preserving contract claims.

### (3) The Plan Documents Do Not Preserve the Stay Violation Claim

The court concludes that the plan documents are not sufficiently "specific and unequivocal" to preserve the stay violation claim asserted against Citgo because neither the Plan nor the Disclosure Statement contain any reference to stay violations or to 11 U.S.C. § 362, the section of the Bankruptcy Code that governs the automatic stay. In <u>In re United Operating</u>, 540 F.3d at 355, the Fifth Circuit cited with approval <u>In re Ice Cream Liquidation</u>, 319 B.R. at 337-38, for its holdings that plan documents that identified specific sections of the Bankruptcy Code pursuant to which preference claims would be brought were sufficient to preserve preference claims, but that because the plan documents failed to reference turnover claims or the section of the Bankruptcy Code that governed such claims, turnover claims had not been preserved. Because the plan documents in this case fail to reference stay violations or § 362 of the Bankruptcy Code, they fail to satisfy the "specific and unequivocal" standard for preserving stay violation claims.

Asserting that "[t]he overarching purpose and policy consideration of Section 1123 is notice,"[43] plaintiff argues that Citgo's motion to dismiss his stay violation claim should

---

[43]Plaintiff's Response, Docket Entry No. 27, p. 20 ¶ 62.

nevertheless be denied because "[d]efendant had actual notice and knowledge of the claim[] . . ."[44] Plaintiff argues that

> [d]efendant received actual notice via email correspondence of the precise claims that are the subject of Counts I and II. On July 14, 2015, approximately two weeks after Plaintiff's Petition Date, Plaintiff's counsel informed Defendant's counsel that "Gas-Mart has instructed my firm to start preparing papers to sue CITGO for violating the automatic stay and its executory contract". A copy of this email is attached as ***Exhibit A***. Furthermore, Defendant is not prejudiced in any way, as Defendant explicitly preserved its defenses against Gas-Mart in anticipation of this litigation in a post-petition Vendor Agreement. Had Defendant so desired, with its knowledge of the potential claims against it, it could have inserted a release in the post-petition Vendor Agreement to obviate any liability.
>
> Thus, because Defendant had actual knowledge and notice of the claims it argues were improperly preserved pursuant to Section 1123, its Motion to Dismiss on this ground should be denied. The primary considerations of Section 1123, such as prejudice, surprise, and lack of notice are completely lacking in the present situation.[45]

Citgo replies that plaintiff's argument "invites the [c]ourt to ignore the Fifth Circuit case law interpreting § 1123 in favor of . . . apply[ing] a new test."[46] Citgo also argues that the email that plaintiff submits as "Exhibit A . . . is both inadmissible and irrelevant."[47] Citgo argues that Exhibit A is inadmissible parole evidence because interpretation of the plan and disclosure

---

[44] Id.

[45] Id. at ¶¶ 62-63.

[46] Citgo's Reply, Docket Entry No. 34, pp. 17-18 ¶ 25.

[47] Id. at 10 ¶ 12.

31

statement is governed by contract principles,[48] and is "irrelevant because it evidences only that *the Debtor* believed that it had a potential claim against CITGO one year prior to confirmation—but not whether that claim was preserved in the Plan and Disclosure Statement such that *Plaintiff* has standing to bring it."[49]

Citgo's actual knowledge of plaintiff's stay violation claim is, as a matter of law, not relevant to the issue of whether plaintiff has standing to pursue that claim because standing is governed by the sufficiency of the retention language in the plan documents.   Although the Fifth Circuit has recognized notice to creditors as an important policy concern behind the "specific and unequivocal" standard articulated in In re United Operating, 540 F.3d at 355, plaintiff has not cited any case in which the Fifth Circuit has considered actual notice to a specific creditor as relevant to whether claims have been sufficiently preserved for post-confirmation prosecution.   Instead, "the notice to creditors that the [Fifth] Circuit and other courts have considered critical in this regard is the general notice to *all* creditors, not merely the actual notice of the defendant in the post-confirmation suit." ASARCO, 514 B.R. at 192 (emphasis in original).   See also In re Texas Wyoming Drilling, 647 F.3d at 550 ("The purpose of the rule is to put 'creditors on notice of any claim [the debtor] wishes to

---

[48]Id.

[49]Id.

pursue after confirmation' and enable 'creditors to determine whether a proposed plan resolves matters satisfactorily before they vote to approve it.'") (quoting In re United Operating, 540 F.3d at 355). In Asarco the bankruptcy court rejected an argument substantially similar to plaintiff's explaining that "United Operating and its progeny, which hold that blanket reservations of claims do not provide standing to pursue such claims post-confirmation, apply even when actual notice is alleged and creditors have been paid in full." 514 B.R. at 192.

2. Plaintiff Lacks Standing to Pursue the Claim for Post-Petition Breaches of a Rejected Contract

Citgo argues that plaintiff is barred from pursuing the breach of contract claim because Gas-Mart elected to reject the Citgo Agreement pursuant to 11 U.S.C. § 365(g).[50] Asserting that rejection constitutes a material breach deemed to have occurred the

---

[50]Plaintiff's Complaint alleges breach of the September 10, 2013, Agreement. See Docket Entry No. 1, p. 10 ¶ 51 (alleging that "[t]he Agreement entered into by and between Gas-Mart and Citgo was a valid and enforceable contract."), ¶ 52 (alleging that "Citgo materially breached the Agreement in several respects, including, but not limited to . . .," and p. 4 ¶ 17 (defining the term "Agreement" as the September 10, 2013, "Marketer Franchise Agreement."). Any contention to the contrary suggested by Plaintiff's Response is contradicted by the Complaint. See Plaintiff's Response, Docket Entry No. 27, p. 13 ¶ 46 (asserting that "the Vendor Agreement was signed post-petition by Citgo, which independently creates the litigation claims against Citgo"). See also Citgo's Reply, Docket Entry No. 34, pp. 20-21 ¶ 30 (arguing against any contention either that the Vendor Agreement is a standalone agreement or that the Complaint alleges breach of the Vendor Agreement).

day before the Petition Date,[51] and that "a fundamental principle of contract law [is] that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance,"[52] Citgo argues that Gas-Mart's prior material breach bars plaintiff's contract claim because the alleged breaches all occurred after the Petition Date.[53]

Without disputing that the breaches alleged in the Complaint all occurred after the Petition Date, plaintiff responds that § 365(g) did not relieve Citgo of its contractual obligations pending Gas-Mart's decision to reject the contract.[54] Citing United States of America on Behalf of the United States Postal Service v. Dewey Freight System, Inc., 31 F.3d 620, 624 (8th Cir. 1994), plaintiff argues that "the non-debtor counter party to an executory contract is obligated to continue performing its obligations under the contract pending the ultimate assumption, assignment, or rejection of that contract by the debtor."[55] Plaintiff argues that

> [d]uring this time, Defendant was required to continue performing its contractual obligations. Defendant's argument would effectively eliminate this requirement,

---

[51]Citgo's Memorandum, Docket Entry No. 15, p. 26 ¶ 67.

[52]Id. at ¶ 69.

[53]Id. at 26-27 ¶¶ 67-70. See also Complaint, Docket Entry No. 1, p. 10 ¶¶ 51-52.

[54]Plaintiff's Response, Docket Entry No. 27, pp. 21-23, ¶¶ 64-66.

[55]Id. at 22 ¶ 65 & n. 8.

relieve non-debtors of their contractual obligations before the contract was ultimately rejected, and alter the substantive rights of the parties, all of which would be contrary to the law.[56]

Without disputing that non-debtor counter parties to executory contracts are obligated to continue performing pending a debtor's ultimate assumption or rejection of the contract, Citgo replies:

Plaintiff cites no case allowing a plaintiff to sue on a rejected contract for alleged breaches after the petition date. Plaintiff provides no authority [in] support of the proposition that the "first to breach rule" has no application in the context on § 365(g), or, more succinctly, that "breach" does not mean "breach."[57]

After carefully reviewing § 365 and Fifth Circuit law applying § 365, the court concludes that while both parties have correctly cited cases applying § 365, neither party has fully demonstrated how that law applies to the facts of this case. For the reasons stated below, the court concludes that Gas-Mart's Rejection of the Citgo Agreement means that plaintiff lacks standing to pursue the contract claim asserted in this action for post-petition breaches.

(a) Applicable Law

Section 365 of the Bankruptcy Code provides that ". . . the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). The term "executory contract" is not defined in the

---

[56]Id. at 22-23 ¶ 66.

[57]Citgo's Reply, Docket Entry No. 34, p. 20 ¶ 28.

Code, but the Fifth Circuit has recognized that "an agreement is executory if at the time of the bankruptcy filing, the failure of either party to complete performance would constitute a material breach of the contract, thereby excusing the performance of the other party." Phoenix Exploration, Inc. v. Yaquinto (In re Murexco Petroleum, Inc.), 15 F.3d 60, 62-63 (5th Cir. 1994) (per curiam). See also id. at n. 8 ("The source of this definition is a two-part article by Professor Vern Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn. L. Rev. 439, 458-62 (1973), and *Executory Contracts in Bankruptcy: Part II*, 57 Minn. L. Rev. 479 (1974)."); National Labor Relations Board v. Bildisco and Bildisco, 104 S. Ct. 1188, 1194 & n. 6 (1984) ("[T]he legislative history to § 365(a) indicates that Congress intended the term to mean a contract 'on which performance is due to some extent on both sides.' H.R.Rep. No. 95-595, p. 347 (1977), see S. Rep. No. 95-989, p. 58 (1977).").

The decision whether to assume or reject an executory contract under § 365 is generally left to the business judgment of the bankruptcy estate. See Mirant Corp. v. Potomac Electric Power Co. (In re Mirant Corp.), 378 F.3d 511, 524 n. 5 (5th Cir. 2004). If the estate elects to assume the executory contract, the estate takes on the burdens associated with the contract, agreeing to cure any outstanding defaults, and committing to perform on a going-forward basis. 11 U.S.C. § 365(b). See Texas Health Enterprises,

Inc. v. Lytle Nursing Home (In re Texas Health Enterprises, Inc.), 72 F. App'x 122, 126 (5th Cir. 2003). Once an executory contract is assumed, § 365(f) authorizes assignment. See 11 U.S.C § 365(f).[58] If the estate elects to reject the contract, the act of rejection is deemed to constitute a breach occurring the day before the filing of the bankruptcy petition, 11 U.S.C. § 365(g)(1),[59] and the non-debtor receives a pre-petition claim for damages arising

---

[58]In pertinent part the statute provides:

(1)   . . . the trustee may assign such contract or lease under paragraph (2) of this subsection.

(2)   The trustee may assign an executory contract or unexpired lease of the debtor only if--

(A)   the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B)   adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f).

[59]In relevant part the statute provides:

(g)   . . . the rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease —

(1)   if such contract or lease has not been assumed under this section or under a plan confirmed under chapter 9, 11, 12, or 13 of this title, immediately before the date of the filing of the petition; . . .

11 U.S.C. § 365(g)(1).

therefrom measured (in the usual case) by the terms of the contract and applicable law. 11 U.S.C. § 502(g)(1).[60] Rejection is an affirmative declaration that the estate will not take on the obligations of a pre-petition contract made by the debtor. Rejection does not terminate the contract, but places the obligation to perform the contract outside of the bankruptcy administration. Eastover Bank for Savings v. Sowashee Venture (In re Austin Development Co.), 19 F.3d 1077, 1082-83 (5th Cir.), cert. denied sub nom. Sowashee Venture v. EB, Inc., 115 S. Ct. 201 (1994).

In re Austin Development involved a lease on non-residential real property; at issue was whether the debtor's failure to timely assume or reject the lease which resulted in a deemed rejection, terminated the lease thereby extinguishing the rights of third-parties, e.g., parties who had taken a sublease from the debtor or a security interest in the debtor's lease interest. Id. at 1080. After analyzing § 365, its statutory antecedents, and policy

---

[60]In relevant part the statute provides:

A claim arising from the rejection, under section 365 of this title or under a plan under chapter 9, 11, 12, or 13 of this title, of an executory contract or unexpired lease of the debtor that has not been assumed shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section or disallowed under section (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.

11 U.S.C. § 502(g)(1).

considerations, the Fifth Circuit concluded that "rejection, does not effect a termination of that lease, or, consequently, an implied forfeiture of the rights of third parties to the lease." Id. at 1083. In reaching this conclusion the Fifth Circuit reasoned that

> [§] 365 derives from § 70(b) of the former Bankruptcy Act, a provision that broadly codified the common law doctrine that allowed the trustee either to assume and perform the debtor's leases or executory contracts or to "reject" them if they were economically burdensome to the estate. See generally Michael T. Andrew, *Executory Contracts in Bankruptcy; Understanding "Rejection,"* 59 U of Colo. L. Rev. 845, 874-81 and n. 136 (1988). This court has held that the deemed rejection of a lease under § 70(b) did not terminate the lease but merely placed the trustee's obligation to perform under the leasehold outside of the bankruptcy administration without destroying the leasehold estate. In re Garfinkle, 577 F.2d 901, 904 (5th Cir. 1978). . .

19 F.3d at 1081. The Fifth Circuit also reasoned that in § 365

> the terms rejection, breach and termination are used differently, but not inconsistently or interchangeably . . . Throughout § 365, rejection refers to the debtor's decision *not to assume* a burdensome lease or executory contract. Section 365(g) states that rejection of a lease "constitutes a breach" except as provided in subsections (h)(2) and (i)(2). Three circuits, including this one, have held that this language does not mean that the executory contract or lease has been terminated, but only that a breach has been deemed to occur. *In re Continental Airlines*, 981 F.2d 1450, 1459 (5th Cir. 1993)("to assert that a contract effectively does not exist as of the date of rejection is inconsistent with deeming the same contract breached").

Id. at 1082. The Fifth Circuit explained that

> [t]he decision to reject is thus correctly viewed only as a "power to breach" the executory contract or lease. As one commentator put it,

> [w]hat the estate's representative is
> rejecting is the contract or lease *asset*,
> which conceivably could carry continuing
> obligations with it into the estate on an
> administrative basis. Rejection simply
> prevents the *estate* from unadvisedly stepping
> into such liabilities. The liabilities are
> not repudiated; to the contrary, as the
> rejection-as-breach doctrine is designed to
> insure, the contract or lease liabilities
> remain in-tact after rejection and give the
> non-debtor party a claim in the distribution
> of the estate.

<u>Id.</u> (quoting Andrew, 59 U of Colo. L. Rev. at 883). <u>See also</u> <u>Bildisco</u>, 104 S. Ct. at 1197 ("the authority to reject an executory contract is vital to the basic purpose of a Chapter 11 reorganization, because rejection can release the debtor's estate from burdensome obligations that can impede a successful reorganization.").

Between the date a bankruptcy petition is filed and an executory contract is assumed or rejected under § 365(a), the contract continues to exist, enforceable by the debtor, but not against the debtor. <u>Dewey Freight</u>, 31 F.3d at 624. <u>See also</u> <u>In re Gunter Hotel Associates</u>, 96 B.R. 696, 700 (Bankr. W.D.Tex. 1988) ("an executory contract under Chapter 11 is not enforceable against the debtor party, but is enforceable against the nondebtor party prior to the debtor's assumption or rejection of the contract."); <u>In re Mirant Corp.</u>, 303 B.R. 319, 328 (Bankr. N.D. Tex. 2003) ("even if a contract is not property of the estate until assumption, a debtor has rights under the contract which *are*

property of the estate and so are protected by the automatic stay from actions of other parties"); Chick Smith Ford, Inc. v. Ford Motor Credit Co. (In re Chick Smith Ford, Inc.), 46 B.R. 515, 519 (Bankr. M.D. Fla. 1985) ("[U]ntil the contract in question is rejected or validly terminated . . ., the Debtor is entitled to compel specific performance and require the [Creditor] to abide by the provisions of the contract[].").

### (b) Application of the Law to the Facts

Neither party disputes that the Agreement plaintiff alleges Citgo breached was an executory contract, that Citgo's alleged breaches all occurred after the Petition Date, or that the Bankruptcy Court entered a Rejection Order pursuant to which Gas-Mart's Executory Contracts, including the Agreement with Citgo, were rejected as of March 10, 2016. Pursuant to 11 U.S.C. § 365 and the Fifth Circuit's reasoning in In re Austin Development, 19 F.3d at 1077, the court concludes that Gas-Mart's rejection of the Citgo Agreement (1) constituted a material breach that triggered a dischargeable, unsecured, pre-petition claim by Citgo against the estate effective immediately before Gas-Mart's bankruptcy, and (2) relieved both the estate and Citgo from post-petition performance obligations. See id. at 1081-84. See also In re CVA General Contractors, Inc., 267 B.R. 773, 777-78 (Bankr. W.D. Tex. 2001) (recognizing that In re Austin Development held that

"rejection has an important but appropriately narrow function: it relieves the estate and nondebtor parties from *future* performance obligations and, by accomplishing a breach, it triggers a dischargeable, unsecured, pre-petition claim against the estate").

Rejection did not cut off the right of Gas-Mart's estate or its successor-in-interest to pursue claims based on pre-petition breaches of the Agreement. <u>See</u> <u>e.g.</u>, <u>Delightful Music Ltd. v. Taylor (In re Taylor)</u>, 913 F.2d 102, 106 (3d Cir. 1990)("To the extent that money is due the debtor for pre-petition services under a personal services contract, the debtor's claim for those sums is undoubtedly an asset of the estate which passes to the trustee/debtor-in-possession. And this is so regardless of whether the trustee later affirms or rejects the contract. Stated otherwise, the issue of affirmance or rejection relates only to those aspects of the contract which remained unfulfilled as of the date the petition was filed."); <u>Williams v. Tomer (In re Tomer)</u>, 128 B.R. 746, 756 (Bankr. S.D. Ill. 1991)("the executed portions of the contracts remain intact, and property rights acquired under the contracts prior to filing became property of the estate despite the trustee's rejection of unperformed obligations of the contracts), <u>aff'd</u>, 147 B.R. 461 (S.D. Ill. 1992). But the breach of contract claim asserted in this action is not for pre-petition breaches.

While plaintiff correctly cites <u>Dewey Freight</u> for holding that "[a]fter a debtor commences a Chapter 11 proceeding, but before

42

executory contracts are assumed or rejected under § 365(a), those contracts remain in existence, *enforceable by the debtor but not against the debtor*," 31 F.3d at 624, relief for post-petition, pre-rejection breaches is available from the bankruptcy court by an order requiring specific performance or an injunction enforcing the automatic stay. See <u>In re Mirant Corp.</u>, 303 B.R. at 328; <u>In re Chick Smith Ford</u>, 46 B.R. at 519. <u>See also</u> <u>In re Mirant Corp.</u>, 440 F.3d 238, 254-55 (5th Cir. 2006) (affirming bankruptcy court's orders directing non-debtor parties to comply with the automatic stay after holding that non-debtor's unilateral termination of an executory contract before debtor had elected to assume or reject under § 365 violated the automatic stay). Before the Citgo Agreement was rejected, remedies for the breaches about which the plaintiff complains were thus available to Gas-Mart from the bankruptcy court in the form of orders for specific performance or violation of the automatic stay. But to the extent that Citgo's alleged breaches violated the automatic stay, for the reasons stated in § II.B.1.(b)(3), above, the court has already concluded that plaintiff lacks standing to pursue this claim because the ability to do so was not preserved in the plan documents.

Plaintiff has not cited and the court has not found any authority allowing a debtor's estate or a successor-in-interest such as the creditor trustee plaintiff in this action to pursue claims for post-petition breaches of a rejected contract. Because rejection is an affirmative declaration by the debtor that the

estate will not take on the obligations of a pre-petition contract made by the debtor, Gas-Mart's rejection of the Citgo Agreement not only relieved the estate of its post-petition performance obligations, but also relieved the estate of its ability to assert claims for post-petition breaches thereof. Moreover, pursuant to § 365(f) executory contracts must be assumed by the debtor **before** they can be assigned. Gas-Mart's rejection of the Citgo Agreement therefore precluded the post-petition breaches from becoming assets of Gas-Mart's estate that could be assigned and transferred to the creditor trust. Accordingly, the court concludes that plaintiff lacks standing to pursue the breach of contract claim asserted in this action.

## C.    **Plaintiff's Request for a Oral Argument**

Plaintiff has requested oral argument on Citgo's motion to dismiss (Docket Entry No. 37). The Court has discretion to grant or deny a request for oral argument. See Rule 7.5A, Local Rules of the United States District Court for the Southern District of Texas ("If a party views oral argument as helpful to the Court, the motion or response may include a request for it. If it is granted, the parties will be notified by the clerk."). Because the court has been able to resolve Citgo's motion to dismiss on the pleadings and briefs without the need for oral argument, plaintiff's request for oral argument will be denied.

**D.   Conclusions: Plaintiff Lacks Standing for Counts I and II**

For the reasons stated in § II.B.1(b)(3), above, the court concludes that plaintiff lacks standing to pursue the stay violation claim asserted in Count II because the plan documents did not preserve the ability to pursue such claims post-confirmation. For the reasons stated in § II.B.1(b)(2), above, the court concludes that the plan documents did preserve the ability to pursue breach of contract claims post-confirmation, but for the reasons stated in § II.B.2, above, the court concludes that plaintiff lacks standing to pursue the breach of contract claim asserted in Count I because that claim alleges post-petition breaches of an Agreement that Gas-Mart rejected pursuant to 11 U.S.C. § 365. Accordingly, Citgo's motion to dismiss Counts I and II for lack of standing will be granted and the plaintiff's claims for breach of contract and violation of the automatic stay will be dismissed without prejudice for lack of subject matter jurisdiction. Although Citgo also argues, in the alternative, that plaintiff's breach of contract claim is subject to dismissal based on res judicata and principles of subrogation, and that plaintiff's stay violation claim is subject to dismissal based on laches, because the court concludes that these claims should be dismissed for lack of subject matter jurisdiction due to the plaintiff's lack of standing, the court need not address these alternative arguments.

### III. <u>**Motion for Summary Judgment on Count III**</u>

In Count III plaintiff seeks to avoid as a preferential transfer, a payment of $68,185.69 that Gas-Mart made to Citgo on or about June 9, 2015.[61]  Citgo denies that this payment qualifies as a preferential transfer, but for purposes of the pending motion Citgo assumes that the prima facie elements of a preferential transfer claim have been established.  Citing 11 U.S.C. § 547(b) and (c)(4), and asserting that after Gas-Mart made the payment at issue, Citgo provided almost $900,000.00 in new fuel deliveries to Gas-Mart that remained unpaid as of the Petition Date, Citgo argues that it is entitled to summary judgment on this claim based on the subsequent new value defense.[62]

### A.    **Standard of Review**

Summary judgment is authorized if the movant establishes that there is no genuine dispute about any material fact and the law entitles it to judgment.  Fed. R. Civ. P. 56(a).  Disputes about material facts are "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 106 S. Ct. 2505, 2511 (1986).  A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not <u>negate</u> the elements

---

[61]Complaint, Docket Entry No. 1, pp. 13-14 ¶¶ 64-73.

[62]Citgo's Memorandum, Docket Entry No. 15, p. 29 ¶¶ 74-75.

of the nonmovant's case." <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994) (<u>en banc</u>), (quoting <u>Celotex Corp. v. Catrett</u>, 106 S. Ct. 2548, 2553-54 (1986)). If the moving party meets this burden, Rule 56(c) requires the nonmovant to go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial. <u>Id.</u> (citing <u>Celotex</u>, 106 S. Ct. at 2553-2554). In reviewing the evidence "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." <u>Reeves v. Sanderson Plumbing Products Inc.</u>, 120 S. Ct. 2097, 2110 (2000). Factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." <u>Little</u>, 37 F.3d at 1075.

**B.    Applicable Law**

Section 547(c)(4) provides in pertinent part that

(c)  The Trustee may not avoid under this section a transfer—

. . .

(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—

(A)  not secured by an otherwise unavoidable security interest; and

> (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.

11 U.S.C. § 547(c)(4). In pertinent part § 547(a)(2) defines "new value" to mean "money or money's worth in goods, services, or new credit. . ." 11 U.S.C. § 547(a)(2). Citing <u>Leidenheimer Baking Co., LLC v. Sharp (In re SGSM Acquisition Co., LLC)</u>, 439 F.3d 233, 241 (5th Cir. 2006), Citgo argues that this statutory language

> creates three elements that must be proven in order to assert the "subsequent" new value defense: (1) the creditor must have extended new value to the debtor or on debtor's behalf after receiving the preference; (2) the new value must be unsecured; and (3) the new value must remain unpaid after its transfer.[63]

Citgo argues that

> all three elements are met. The alleged preferential transfer was made on June 9, 2015. CITGO provided additional fuel to Debtor valued at $891,613.99 from June 10, 2015 through July 1, 2015, all of which deliveries were *after* the alleged transfer. *See* Statement of Facts ("SOF"), ¶ 40. The first temporal element is satisfied. The fuel sales were not secured by any collateral. As of the Petition Date, CITGO held Credit Card Receipts valued at $221,190.12, assuming the Credit Card Receipts were subject to setoff, the net unsecured claim of CITGO was $670,423.87 as of the Petition Date, an amount substantially in excess of the alleged preferential payment of $68,185.69. *See* SOF, ¶ 5. Thus, the second element is met. Although CITGO had a bond in place with the Surety, such financial arrangement is not a security interest. . . Lastly, CITGO's net unsecured claim remained due and payable as of the Petition Date, satisfying the third element. *See* SOF, ¶ 41.[64]

---

[63]Citgo's Memorandum, Docket Entry No. 15, p. 30 ¶ 76.

[64]<u>Id.</u> at ¶ 77 (citation omitted).

As evidence that it provided fuel to Gas-Mart valued at $891,613.99 from June 10, 2015, through July 1, 2015, CITGO cites the affidavit of Citgo Senior Credit Manager, Karina Estrada-Jaime, as well as invoices, Exhibit 11, and a summary thereof, Exhibit 12, attached to Citgo's memorandum.[65] As evidence that Citgo held Credit Card Receipts valued at $221,190.12 as of the Petition Date, and that its net unpaid and unsecured claim as of that date was $670,423.87 or more, Citgo cites ¶ 5 of the Statement of Facts included in its Memorandum,[66] to which plaintiff has responded, "Admitted/Uncontroverted."[67]

Citing Federal Rule of Civil Procedure 56(d), plaintiff "objects to Defendant's motion for summary judgment, as it is premature, raises issues of fact that require discovery, and it is too early in the proceeding for Plaintiff to properly respond."[68] Then, without disputing that Citgo provided fuel to Gas-Mart valued at $891,613.99 from June 10, 2015, through July 1, 2015, or that as

---

[65]Affidavit of Citgo Petroleum Corporation in Support of Its Motion to Dismiss or in the Alternative for Summary Judgment, Docket Entry No. 15-1, ¶ 7 ("Between June 9, 2015, and July 2, 2015, CITGO provided additional fuel in the amount of $891,613.99. Group Exhibit 11 and Exhibit 12, both reflecting the value of the fuel provided, are attached to the Memorandum. . ."); Exhibit 11, Docket Entry No. 15-13, and Exhibit 12, Docket Entry No. 15-14.

[66]Citgo's Memorandum, Docket Entry No. 15, p. 30 ¶ 77 (citing id. at 7 ¶ 5.

[67]Plaintiff's Response, Docket Entry No. 27, p. 10 ¶ 5.

[68]Id. at 16 ¶ 55.

of the Petition Date, Citgo held an unpaid and unsecured claim of $670,423.87 or more, plaintiff argues that "[d]efendant has failed to satisfy its burden of proof and production on the affirmative subsequent new value defense."[69] Asserting that a creditor relying on the subsequent new value defense bears the burden of proof and production, plaintiff argues that

> [d]efendant has not produce sufficient evidence to support this affirmative defense. Pursuant to Fed. R. Civ. P. 56(c)(2), [d]efendant has not produced any facts or evidence in a form that would be admissible at trial. Accordingly, [d]efendant's motion to dismiss Count III, or in the alternative for summary judgment, should be denied.[70]

Citgo replies that

> Rule 56 requires that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). The Affidavit [of Karina Estrada-Jaime] is made on personal knowledge and identifies that the Invoices are true and correct copies of business records for which the Affiant is the records custodian. The Invoices are business records admissible under Fed. R. Evid. 803(6)(B) for the truth of the matter. Those invoices identify the amount of fuel, the price of the fuel and their delivery date (a date after the alleged preferential transfer).[71]

---

[69]_Id._ at 27 ¶ 81.

[70]_Id._

[71]Citgo's Reply, Docket Entry No. 34, p. 23 ¶ 34.

## C. **Application of the Law to the Undisputed Facts**

Although this action is in an early stage in which Citgo has yet to file an answer and discovery has yet to begin, the controversy between the parties has a long history that is reflected in the factual background set forth in § I, above. Plaintiff's objection to Citgo's motion for summary judgment as premature because it raises issues of fact that require discovery, and reference to Rule 56(d) in support thereof has no merit. Rule 56(d) is titled, "When Facts Are Unavailable to the Nonmovant," and in pertinent part requires a party seeking relief thereunder to "show[] by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). Plaintiff has neither submitted an affidavit or declaration, nor presented any reasons why facts essential to justify its opposition to Citgo's motion are unavailable absent discovery. Accordingly, plaintiff has failed to satisfy the requirements for relief under Rule 56(d).

Plaintiff also argues that Citgo's motion for summary judgment should be denied because "[d]efendant has not produced any facts or evidence in a form that would be admissible at trial."[72] Federal Rule 56(c)(2) provides that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence," but plaintiff has not shown

---

[72]Plaintiff's Response, Docket Entry No. 27, p. 27 ¶ 81.

that Citgo's evidence would not be admissible at trial. For that reason and because Citgo's evidence is admissible under Rule 803(6) as business records, plaintiff's objection to that evidence lacks any basis in law or fact.

A district court may not grant summary judgment by default simply because there is no substantive opposition to the motion. The court may, however, accept as undisputed the movant's version of the facts and grant a motion for summary judgment when the movant has made a prima facie showing of entitlement to summary judgment. <u>John v. State of Louisiana (Board of Trustees for State Colleges and Universities</u>), 757 F.2d 698, 707-08 (5th Cir. 1985). <u>See</u> <u>Eversley v. Mbank Dallas</u>, 843 F.2d 172, 174 (5th Cir. 1988) (holding that the court did not err by granting a motion for summary judgment when the movant's submittals make a prima facie showing of entitlement to judgment as a matter of law). Because Citgo's version of the facts as contained in the affidavit of Karina Estrada-Jaime and the business records attached thereto establish that **after** Gas-Mart made the $68,185.69 payment alleged to be preferential, Citgo provided Gas-Mart $891,613.19 of new fuel for which Citgo had not received payment as of the Petition Date, and because plaintiff has not submitted any evidence capable of disputing Citgo's version of the facts, the court concludes that Citgo is entitled to judgment as a matter of law on the preferential transfer claim alleged in Count III of plaintiff's Complaint (Docket Entry No. 1).

## IV. **Conclusions and Order**

For the reasons stated in § II, above, the court concludes that Counts I and II are subject to dismissal without prejudice for lack of subject matter jurisdiction because plaintiff lacks standing to pursue the claims for breach of contract asserted in Count I and violation of the automatic stay asserted in Count II. For the reasons stated in § III, above, the court concludes that Citgo is entitled to summary judgment on plaintiff's claim for preferential transfer asserted in Count III. Accordingly, Citgo Petroleum Corporation's Motion to Dismiss Counts I and II and for Summary Judgment as to Count III (Docket Entry No. 14) is **GRANTED**.[73]

For the reasons stated in § II.C, above, plaintiff's Request for Oral Argument (Docket Entry No. 37) is **DENIED**.

For the reasons stated in § II.B.1, plaintiff's Motion for Leave to File Supplemental Authority in Support of Plaintiff's Response to Defendant's Motion to Dismiss (Docket Entry No. 38) is

---

[73]The court has allowed the parties extraordinary leeway in submitting lengthy briefs and other written materials in connection with the pending motions. As the length of this Memorandum Opinion and Order indicates, the court has expended considerable time reading these papers and performing a significant amount of independent research to be as fully informed as possible when addressing the parties' arguments. While, because of the sheer volume of information presented, it is not impossible that some arguments were overlooked, the parties should assume that failure to expressly address a particular argument in this Memorandum Opinion and Order reflects the court's judgment that the argument lacked sufficient merit to warrant discussion. Accordingly, the court strongly discourages the parties from seeking reconsideration based on arguments they have previously raised or that they could have raised.

**GRANTED**, and plaintiff's Motion for Leave to File Supplemental Authority in Support of Plaintiff's Response to Defendant's Motion to Dismiss (Docket Entry No. 41) is **GRANTED**.

SIGNED at Houston, Texas, this 8th day of February, 2018.

SIM LAKE
UNITED STATES DISTRICT JUDGE